UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

KHALED BILAL HASSAN,

     Defendant.

Case No. **18-cr-20089-02**

Hon. **Matthew F. Leitman**
**United States District Judge**

_____/

---

### DEFENDANT'S EMERGENCY MOTION
### FOR IMMEDIATE REDUCTION OF SENTENCE
### (COMPASSIONATE RELEASE)

---

NOW COMES, Defendant Khaled Bilal Hassan ("Mr. Hassan"), by his counsel Amir I. Makled, through Hall Makled, PC, respectfully moves this Honorable Court, pursuant to the First Step Act of 2018 (the "FSA") and pursuant to 18 U.S.C. §3582(c)(1)(A)(i), to modify Mr. Hassan's 18-month term of imprisonment to time served, and to impose a special condition that he serve a period of home confinement on supervised release. Such a modification will effectively allow him to finish the remaining portion of his prison sentence on home confinement, which will in turn allow him to protect himself, the Bureau of Prisons (the "BOP"), and the community at large from the spread of the Novel Coronavirus 2019 ("COVID-19"), by sheltering in place at his residence.

1

This compassionate release and modification of sentence is necessary for Mr. Hassan's serious underlying and pre-existing medical conditions, including Asthma and Diabetes: Type-Two. Mr. Hassan is symptomatic in his conditions, and experiences chest pain and shortness of breath as a result. He must vigorously monitor these conditions to prevent any further complications. He is currently prescribed medication to help alleviate the symptoms associated with his diagnosis.

Note, on July 27, 2020, the undersigned Counsel attempted to seek concurrence in this Motion, and the requested relief, pursuant to LR 7.1(a), by contacting the Assistant United States Attorney, Chris Rawsthorne.

## INTRODUCTION

On September 19, 2019, this Honorable Court sentenced Khaled Hassan to 18 months incarceration for 18 U.S.C. § 1342 and 18 U.S.C. § 1349; Conspiracy to Commit Mail Fraud. Title 18 U.S.C. §3582 states that the administrative procedure for requesting a compassionate release is through the warden of the BOP facility where the inmate is located.

On May 29, 2020 Mr. Hassan filed a Motion for Compassionate Release unto this Honorable Court. On June 12, 2020, Mr. Hassan's Motion was denied without prejudice for failure to satisfy either requirement provided in 18 USC §3582(c)(1)(A). This Honorable Court instructed Mr. Hassan that he may re-file a Motion for Compassionate Release after he complied with §3582(c)(1)(A), a which

point the Court will consider the merits of Mr. Hassan's motion. [**Exhibit A** – Order Denying Mr. Hassan's Compassionate Release Motion]. On or about June 17, 2020, Mr. Hassan submitted an inmate request to the Warden for an early release, and his request was denied on July 7, 2020. [**Exhibit B** – Inmate Request for Reduction in Sentence]. Now, Mr. Hassan submits the instant Motion for Immediate Reduction of Sentence (Compassionate Release).

## FACTUAL BACKGROUND

### I. Defendant's Background and Criminal History

Khaled Hassan is a 34 year old male, who suffers from chronic or serious medical problems, i.e., Asthma, Diabetes: Type-Two. [see attached **Exhibit C**] Mr. Hassan is a low security inmate, who was sentenced to a term of 18 months for Conspiracy to Commit Mail Fraud. He was sentenced by this Honorable Court on September 19, 2018. At this time, Mr. Hassan has served approximately half of the 18 month sentence. Prior to the aforementioned conviction, Mr. Hassan has no history of Adult Criminal Convictions, other Criminal Conduct or pending charges.

Mr. Hassan also has very strong family ties. He has a wife, who is unemployed, and three children. His parents and in-laws are also all very supportive of him. Prior to his incarceration he was employed at The Oil Exchange in Warren, Michigan and he has been advised that he can return to that employment.

### II. The COVID-19 Pandemic

3

On Tuesday, March 10 Governor Gretchen Whitmer declared a state of emergency in Michigan as a result of the COVID-19 crisis. Executive Order, No. 2020-04 (March 10, 2020). On March 11, 2020, the World Health Organization officially classified COVID-19 a pandemic[1]. On March 13, 2020, the President of the United States declared a national emergency due to the novel coronavirus disease (COVID-19)[2]. On March 15, the Michigan Supreme Court issued Administrative Order No. 2020-1, urging all state courts to "take any . . . . reasonable measures to avoid exposing participants in court proceedings, court employees, and the general public to the COVID-19 crisis." The order further instructs courts specifically to "take into careful consideration public health factors arising out of the present state of emergency . . . in making pretrial release decisions, including in determining any conditions of release." Additional protective measures have been taken in Michigan since that date, including but not limited to closing schools, canceling all large gatherings, and initiating the "Stay Home, Stay Safe" Executive Order.

As of May 27, 2020, the novel coronavirus (COVID- 19), has infected over 5.61 Million people, leading to at least 351,000 deaths worldwide.[3] In Michigan, as

[1] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020) at https://bit.ly/2W8dwpS.

[2] *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, The White House (Mar. 13, 2020) https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

[3] Coronavirus Map: Tracking the Spread of the Outbreak, The New York Times (March 12,

of May 27, 2020, there are 54,000 of positive cases of COVID-19 and over 5,000 confirmed deaths.

The CDC has issued guidance that individuals at higher risk of contracting COVID-19 [4]--- adults over 65 years old and <u>people of all ages with underlying medical conditions, particularly if not well controlled, including people with chronic lung disease or moderate to severe asthma, people who have serious heart conditions, people who are immunocompromised, people with severe obesity (body mass index [BMI] of 40 or higher), people with diabetes, people with chronic kidney disease undergoing dialysis, people with liver disease.</u>

## III.  Conditions at FCI Morgantown

On March 23, 2020, the CDC acknowledged that correctional and detention facilities "present [] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff and visitors[5]." Specifically, the CDC noted that many detention conditions create a heighted risk of danger to detainees. These conditions include low capacity for patient volume, insufficient quarantine space,

---

2020), at https://nyti.ms/2U4kmud (updating regularly).

[4] People Who are at Higher Risk Severe Illness; https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

[5] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control (March 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

insufficient on-site medical staff, limited ability of incarcerated/detained persons to exercise effective disease prevention measures, etc. *Id.*

The Coronavirus is now reported to exist amongst staff and inmates at FCI Morgantown, and the Federal Bureau of Prisons  reportedly is not testing anyone who is not seriously ill, according to its public website. It is anticipated that the Coronavirus is more widespread in the BOP than reported, and it is clear that Mr. Hassan has been exposed and is not being protected as he should be due to his poor health, and that his life is now at extreme risk. Mr. Hassan is presently on lockdown at the facility, because of the virus and is only allowed out for an hour, otherwise he is in closed quarters with who knows, how many COVID-19 carriers. Prior, to Mr. Hassan being placed on lock down, he was granted passes, which allowed him to go outside into the yard, without restraints. Mr. Hassan's medical conditions, combined with his remaining time to serve on his sentence and the high risk posed by COVID-19.

## LAW AND ANALYSIS

### I.    Jurisdiction of This Court: Exhaustion.

The First Step Act (the "FSA") does not require mandatory administrative exhaustion for motions for reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) The plain text of the FSA gives courts power to consider a motion for reduction in sentencing without requiring full administrative remedies.

On or about June 17, 2020,  Mr. Hassan directed a request for reduction in sentence to F.J. Bowers, Warden of FCI Morgantown (where Mr. Hassan is currently detained). Mr. Hassan has waited 30 days from the receipt of this request to be released by the Warden, as required by 18 U.S.C. §3582(c)(1)(A). The statutory text of §3582(c)(1)(A), provides as follows:

> (C) The court may not modify a term of imprisonment once it has been imposed, except that:
>
>> (1)(A) in any case -- the court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or **the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier** may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section §3553(a) to the extent that they are applicable, if it finds that –
>>
>>> (i) **extraordinary and compelling reasons** warrant such a reduction

Thus, the FSA's compassionate release provision grants the sentencing court the power to reduce a prisoner's sentence when "extraordinary and compelling reasons warrant such a reduction."

Additionally, this language does not make exhaustion of administrative remedies mandatory. The plain text gives this Court the power and authority to reduce a sentence even without exhaustion of remedies in those contexts. The Court

has such power whenever the Director of the Bureau of Prisons makes the motion or "the lapse of 30 days from the receipt of [a] request by the warden of the defendant's facility " *Id*.

Mr. Hassan's health and novel coronavirus  (COVID-19) certainly place him in extraordinary and compelling reasons for early release and meets other criteria. As such, Mr. Hassan respectfully suggests that there are three circumstances where failure to exhaust may be excused: (1) Exhaustion may be unnecessary where it would be futile, either because agency decision makers are biased or because the agency has already determined the issue; (2) exhaustion may be unnecessary where the administrative remedy process would be incapable of granting adequate relief; (3) exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice. *See, United States of America v. Wilson Perez*, USDC SDNY 17.Cr.513 (4/1/2020), citing *Washington v. Barr*, 925 F. 3d 109, 118(2d Cir. 2019) (citing *McCarthy v. Madigan*, 503 U.S. 140, 146-47 (1992).

The courts' power under § 3582(c)(2) also supports this view that administrative exhaustion is not jurisdictionally required. Subsection (c)(2) provides as follows:

> in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent

8

> that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. 18 USC §3582(c)(2).

Therefore, subsection (c)(2) operates as another provision granting courts the power to "reduce the term of imprisonment," permitting the court to act "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. §994(o)." Moreover, "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.*

Circuit Courts have found that the District Courts have jurisdiction to consider the motion to reduce a sentence because the Courts are empowered generally to have jurisdiction over federal criminal cases. In other words, section 3582(c) is not the source of the court's jurisdiction. *See U.S. v. Taylor,* 778 F.3d 667, 671 (7th Cir. 2015) ("[Section] 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment. . .[n]or is subsection (c) phrased in jurisdictional terms.")[6] Accordingly, §3582(c) generally should not be understood to impose jurisdictional prerequisites related to exhaustion.

---

[6] See also U.S. v. Calton, 900 F.3d 706, 710-11 (5th Cir. 2018) (citing U.S. v. Caraballo-Martinez, 866 F.3d 1233, 1243 (11th Cir. 2017); U.S. v. May, 855 F.3d 271, 274-75 (4th Cir. 2017); U.S. v. Trujillo, 713 F.3d 1003, 1005 (9th Cir. 2013); U.S. v. Green, 886 F.3d 1300, 1306 (10th Cir. 2018) (rejecting claim of jurisdictional bar).

Likewise, when the movant is facing irreparable harm and futility, courts have consistently waived exhaustion of administrative remedies. *Garza v. Davis* 596 F.3d 1198, 1203-04 (10th Cir. 2010) (recognizing futility exception in context of § 2241 petition); *Woodall v. Federal Bureau of Prisons,* 432 F.3d 235, 239 n.2 (3d Cir. 2005) ("[E]xhaustion would be futile, given that Woodall is not challenging the application of the BOP regulations, but their validity") *Elwood v. Jeter,* 386 F.3d 842, 844, n.1 (8th Cir. 2004); *Fournier v. Zickefoose*, 620 F. Supp. 2d 313, 317 (D. Conn. 2009); *Boucher v. Lamanna,* 90 F.Supp. 2d 883, 887 (N.D. Ohio 2000) (concluding that exhaustion of administrative remedies would be futile where the BOP's policy on categorizing the prisoner's offense as a violent crime was mandatory, the issue was a legal one that the BOP had consistently defended, and the potential for immediate release counseled timely consideration of the petitioner's case) [7]

Particularly in the compassionate release context, courts have recognized that under appropriate circumstances, seeking relief from the BOP can be futile, and so, exhaustion of administrative remedies is waived. *Thody v. Swain*, 2019 U.S. Dist.

---

[7] See also Chevrier v. Marberry, 2006 WL 3759909, *2-3 (E.D. Mich. Dec. 20, 2006); Cushenberry v. Federal Medical Center, 530 F. Supp. 2d 908, 912 (E.D. Ky. 2008); Zucker v. Menifee, 2004 WL 102779, *4 (S.D.N.Y. Jan. 21, 2004); Snyder Angelini, 2008 WL 4773142, *2 (E.D.N.Y. Oct. 27, 2008); Ross v. Fondren, No. 08-325, 2008 WL 4745671 (D. Minn. Oct. 29, 2008); Kelly v. Daniels, 469 F. Supp. 2d 903, 904 (D. Or. 2007); Scott v. Lindsay, 2007 WL 2585072, at *2 (E.D.N.Y. Sept. 10. 2007).

LEXIS 226582, *5 (C.D. Ca. Nov. 26, 2019) (*citing Fraley v. United States Bureau of Prisons,* 1 F.3d 924 (9th Cir. 1993) (where administrative appeal to Regional Director certainly denied request based on BOP policy, further application for administrative remedies would be futile)); *Merth v. Puentes*, 2019 U.S. Dist. LEXIS 114799, *8 (E.D. Ca July 10, 2019) (holding administrative exhaustion of FSA's remedies would be futile)); *Merth v. Puentes*, 2019 U.S. Dist. LEXIS 114799, *8 (E.D. Ca July 10, 2019) (holding administrative exhaustion of FSA's good time credits provision futile and so waived)[8]

These conclusions are also supported by other provisions in the FSA. Specifically, the FSA carves out notice and expedited administrative consideration for prisoners with terminal illnesses. 18 U.S.C. § 3582(d). Both the language of the FSA and the legislative history support the conclusion that full exhaustion of administrative remedies is subject to exceptions, and it is not mandatory.

Confirmed cases of COVID-19 continue to accumulate daily. Those with underlying medical conditions must take immediate preventative actions, including avoiding crowded areas and staying home as much as possible. This also pertains to Michigan, since the community continues to spread the disease, we must take

---

[8] Cf U.S. v. Mills, 2019 U.S. Dist. LEXIS 10954, *3 (M.D.Fl. January 23, 2019) (prisoner cannot invoke futility of administrative remedies when he requested compassionate release before the enactment of FSA).

every necessary action to protect vulnerable populations and the community at large. Most importantly, according to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings." Outbreaks of the flu regularly occur in jails[9], and during the H1N1 epidemic in 2009, many prisons dealt with high numbers of cases[10]. Therefore, because extraordinary and compelling reasons exist to warrant a reduction of Mr. Hassan's sentence, exhaustion is not required and this Honorable Court has jurisdiction over this Motion for Compassionate Release.

## II.   Reasons Action by This Honorable Court is Warranted Now.

Congress did not define what would constitute an "extraordinary and compelling reason" warranting a reduction of a sentence under § 3582(c). Indeed, the legislative history confirms that it intended to grant federal sentencing courts broad discretion to make those determinations on a case-by-case basis, and to reduce fundamentally unfair sentences where such reasons exist.

The FSA provides that the defendant has the authority to make this motion to the warden of defendant's facility, and the warden has the authority to make this

---

[9] Joseph A. Bick (2007). Infection Control in Jails and Prisons. Clinical Infectious Diseases 45(8)) P:1047-1055, at http://www.antoniocasella.eu/salute/Bick_oct2007.pdf

[10] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S.

recommendation to the central office who forwards this to the sentencing judge for action.  As such, Mr. Hassan's immediate concerns are that his health issues are extreme; notwithstanding the fact that, the Defendant has been hospitalized at least three times and is receiving what limited care the prison can provide for enough care for his health issues. Finally, Mr. Hassan should be excused from exhausting his administrative remedies because the BOP does not have any policy in place to consider requests based on COVID-19. Therefore, any such request would be futile. To date, the BOP's response to the COVID-19 pandemic has not included the urgent identification and consideration for early release those prisoners who are at a higher risk from this disease.

In recent weeks, COVID-19 has spread throughout the United States, infecting thousands of Americans and inflicting many with severe respiratory illness; many Americans have perished[11]. On March 11, 2020, the World Health Organization described the COVID-19 outbreak as a global pandemic. COVID-19 poses a fatal risk to people 60 years of age and older and those with preexisting conditions[12].

[11] Department of Justice, Bureau of Justice Statistics, at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[12] See generally CDC: COVID-19 Situation Summary, available at https://www.cdc.gov/coronavirus/2019- ncov/cases-updates/summary.html See Centers of Disease Control and Prevention, People Who are at Higher Risk Severe Illness; https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

Khaled Hassan is a 34 year old male, who suffers from chronic or serious medical problems, i.e., Asthma, Diabetes: Type-Two. Mr. Hassan has served one-half of the 18 month sentence. Mr. Hassan has also been a model prisoner. Moreover, leaving Mr. Hassan in custody to become infected with COVID- 19 endangers the entire community, not just Mr. Hassan. Whether or not Mr. Hassan eventually contracts COVID-19, his medical care will drain urgently needed resources from the community. The emerging consensus among public health experts is that it is absolutely critical to reduce the number of people incarcerated in order to both contain the spread of COVID-19 and to reduce the impact on medical resources. Given these facts, Mr. Hassan's continued detention cannot be justified.

Therefore, Mr. Hassan's request for urgent compassionate release based on the COVID-19 pandemic will be futile because BOP's policy response does not currently include any emergency or urgent consideration of early release or the recommendation for a reduction in sentence on the basis of the COVID-19 pandemic. Since BOP has not created an emergency administrative remedy for prisoners at serious risk from COVID-19, seeking such urgent administrative relief constitutes an exception to the exhaustion requirement on the basis of futility. See *Fletcher v Menard Correctional Center*, 623 F.3d1171, 174 (7th Cir. 2010) ("If it takes two weeks to exhaust a complaint that the complainant is in danger of being

14

killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust").

The FSA benefits persons who suffer from chronic health concerns, and are on a terminal track. Mr. Hassan appears to fit this criteria, as there is a concern that the Asthma has recurred. This vulnerable, young man has been exposed to the Novel Coronavirus and several prisoners have been placed in isolation. Mr. Hassan is in the highest risk category of individuals who face grave health consequences or death from exposure to COVID-19. The condition did not manifest itself until Mr. Hassan was incarcerated. However, now he has multiple health issues, which under the best circumstances would be a challenge now you add the coronavirus and his life is in serious danger. It is requested that this Court order that Mr. Hassan be immediately released pursuant to the First Step Act.

## III.   Extraordinary and Compelling Reasons for Release.

Mr. Hassan has maintained excellent conduct at FCI Morgantown facility. He is at the lowest security level as of this writing. He is presently on lockdown at the facility because of the virus and is only allowed out for an hour, otherwise he is in closed quarters with, who knows how many COVID-19 carriers. Prior to Mr. Hassan being placed on lock down, he was granted passes, allowing him to go outside into the yard without restraints. Mr. Hassan's medical conditions, combined with his remaining time to serve, and the high risk posed by COVID-19 clears the

high bar set by §3582(c)(1)(A). As discussed in the recent opinion and order in *United States v. Wilson Perez13*, two reasons for release were defined: (1) "extraordinary and compelling circumstances exist where the defendant is suffering from serious physical or medical conditions…that substantially diminishes the ability to provide self-care within the environment of a correctional facility "; (2) 1B1.13, n.1(D) authorizes release based on "extraordinary and compelling reasons other than, or in combination with, the [other] reasons described." The Court in *Perez* found that the seriousness of the disease coupled with the inmate's inability to distance himself from others and to protect himself in his close-quarters confinement from other inmates and staff who could be infected with COVID-19, were facts relevant to consider in evaluating whether or not the inmate was a serious candidate for release under the First Step Act.

When, Mr. Hassan surrendered to prison, he was a healthy human being and now, he suffers from illnesses that will be life threatening combined with COVID-19. Now, it seems he suffers from these illnesses, and due to the close quarters and the inability to follow social distancing, to wear protective gear, or to follow any of the CDC protocols to be safe from COVID-19, he is exposed. He was not being well-cared for before the COVID-19 pandemic. He is now unable to be transported to the

---

13 United States v. Wilson Perez, Case No. 17 Cr. 513-3 (AT), Southern District of New York, Judge Analisa Torres, April 1, 2020.

hospital to be tested for illnesses in the event there is an onset of a virus, and he is now on lockdown, because of the fear of the exposure to COVID-19.

**IV.    A reduction in sentence is warranted considering the other sentencing factors.**

Mr. Hassan was convicted of nonviolent crimes that involved Conspiracy to commit mail fraud. He also has very strong family ties. His wife and three children, as well as his parents and in-laws are all very supportive of him. Prior to his incarceration he was employed at The Oil Exchange in Warren, Michigan and he has been advised that he can return to that employment. He does not present a danger to the safety of any person or the community

**V.    Residence if transferred to Supervised Release.**

If this request for compassionate release/RIS is granted under the First Step Act, Mr. Hassan will live with his wife and children, who reside in Dearborn Heights, Michigan. This is a private residence where he has the ability to quarantine for 14 days. He has the ability to secure medical insurance.

## CONCLUSION

With the passage of the First Step Act, Congress emphasized the imperative need to reducing unnecessary incarceration and avoiding unduly punitive sentences that do not serve the ends of justice. Mr. Hassan asks for the mercy of the court to allow him to self-isolate during this pandemic, and respectfully requests that this Honorable Court take this opportunity to grant a reduction in his sentence based on

extraordinary and compelling reasons.

For Mr. Hassan, nothing could be more extraordinary and compelling than this pandemic. Early research shows that diabetes patients, like Mr. Hassan, have mortality rates that are more than twice as high as overall mortality rates[14]. One recent report revealed: "Among 784 patients with diabetes, half were hospitalized, including 148 (18.8%) in intensive care. That compares with 2.2% of those with no underlying conditions needing ICU treatment[15]."

These statistics—which focus on the non-prison population—become even more concerning when considered in the prison context. (see "FCI Morgantown Conditions" above). Prisons are tinder boxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities.

Furthermore, as provided above, the FSA allows a court to reduce an inmate's sentence if the court finds that (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing

---

[14] See Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf

[15] Tom Avril, How much diabetes, smoking, and other risk factors worsen your coronavirus odds, Philadelphia Inquirer (Mar. 31, 2020), https://www.inquirer.com/health/coronavirus/coronavirus-underlying-conditionns- heart-lung-kidney-cdc-20200331.html

factors under § 3553(a) warrant a reduction. 18 U.S.C. § 3852(c)(1)(A). Congress has not defined the term "extraordinary and compelling," but the Sentencing Commission has issued a policy defining the term. The policy statement lists three specific examples of "extraordinary and compelling reasons," none of which apply to Mr. Hassan. U.S.S.G. § 1B1.13 cmt.n.1(A)-(C). It also provides a fourth "catchall" provision if the Director of the Bureau of Prisons determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described," *Id.* § 1B1.13, cmt.n.1(D).

Mr. Hassan's position is that, in light of the FSA, the Court is no longer bound by the policy statement. Therefore, the Court can and should exercise its discretion to determine that "extraordinary and compelling reasons" exist for his release. The Government may argue that Mr. Hassan does not meet any of the enumerated criteria in the policy statement, and that the Court cannot independently assess whether other extraordinary and compelling reasons exist that warrant a sentence reduction. However, Mr. Hassan argues that (1) the Court may independently assess whether "extraordinary and compelling reasons" exist; (2) the COVID-19 pandemic—in combination with Mr. Hassan's underlying health conditions, proximity to his release date, and rehabilitation—constitute "extraordinary and compelling reasons" that warrant a reduction; (3) Mr. Hassan is not a danger to his community; and (4) the factors under § 3553(a) favor reducing Mr. Hassan's

sentence

Federal courts may reduce a prisoner's sentence under the circumstances outlined in 18 U.S.C §3852(c). Prior to 2018 only the Director of the Bureau of Prisons ("BOP") could file these kinds of "compassionate-release motions." *United States v Brown*, 411 F. Supp. 3d 466,  448 (S.D. Iowa 2019). Yet, the BOP rarely does                                                                                           so. The BOP was first authorized to file compassionate-release motions in 1984. From 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). According to a 2013 report from the Office of the Inspector General, these low numbers resulted, in part, because the BOP's "compassionate release program had been poorly managed and implemented inconsistently,…resulting in eligible inmates… not being considered for release, and terminally ill inmates dying before their requests were decided." *Id*.  The  report also found that the BOP "did not have clear standards as to when compassionate release is warranted and…BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id.*

Against this backdrop, Congress passed and President Trump signed the First Step Act in 2018, a landmark piece of criminal-justice reform legislation that

"amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Brown*, 411 F. Supp. 3d at 448 (citing Cong. Research Serv., R4558, *The First Step Act of 2018: An Overview* 1 (2019)).

In an effort to improve and increase the use of the compassionate- release process, the First Step Act amended §3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role[16]. Congress made this change in § 603 (b) of the First Step Act. Section 603(b)'s purpose is enshrined in its title: "Increasing the Use and Transparency of Compassionate Release." Section 603 (b) was initially a standalone bill that "explicitly sought to "improve the compassionate release process of the Bureau of Prisons." *Brown*, 411 F. Supp. 3d at 451 (quoting Granting Release and Compassion Effectively Act of 2018, S. 2471, 11th Cong. (2018).

The amendment to § 3682(c)(1)(A) provided prisoners with two direct routes to court: (1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a motion, or (2) file a motion after "the lapse of 30 days from the receipt...of such a request" by the warden of the defendant's facility, "whichever is

---

[16] See also United States v. Redd, 2020 WL 1248493, at *7(E.D. Va. Mar. 16, 2020)("The First Step Act was passed against the backdrop of documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."); 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act)("[T{he bill expands compassionate release...and expedites compassionate release applications.").

earlier." 18 U.S.C. § 3852(c)(1)(A). These changes gave the "district judge…the ability to grant a prisoner's motion for compassionate release even in the face of BOP opposition or its failure to respond to the prisoner's compassionate release request in a timely manner." *United Sates v. Young*, 2020 WL 1047815, at \*5(M.D. Tenn. Mar. 3, 2020). The substantive criteria of § 3582(c)(1)(A)(i) remained the same. Congress never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation…alone" does not suffice. 18 U.S.C. § 994(t). Rather, Congress directed the Sentencing Commission to define the term. *Id*. The Commission did so prior to the passage of the First Step Act, but has not since updated the policy statement. See U.S.S.G. § 1B1.13 cmt.n.1(A)-(D). In subsections (A)-(C) of an Application Note to U.S.S.G. §1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging- related health decline where a defendant is over 65 years old and has serve at least ten years or 75% of his sentence; or (c) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. *See id*. cmt.n.1(A)-(C). The policy statement also added a catchall provision that

22

gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id*. cmt. n1(D).

Thus, implicitly, recognizing that it is impossible to package all "extraordinary and compelling" circumstances into three neat boxes, the Commission made subsections (A)-(C) non-exclusive by creating a catchall that recognized that other "compelling reason" could exist. See *United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that §1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, ---F. Supp. 3d ----, 2019 WL 2716505 at *8 (M.D.N.C. June 2, 2019) "(Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstance.").

The Commission has not updated its policy statement to account for the changes imposed by the First Step Act[17], and the policy statement is now clearly outdated.

The very first sentence of § 1B1.13 constrains the entire policy statement to motions

---

[17] As several courts have recognized, the Commission is unable to update the Sentencing Guidelines because, at the moment, it lacks a sufficient number of appointed commissioners to take this action. *See, e.g., United States v. Maumau,* No. 08-cr-00785, 2020 WL 806121, at *1n.3 (Feb. 18, 2020).

23

filed solely by the BOP. And an Application Note also explicitly confines the policy statement to such motions. *See* U.S.S.G. §1B1.13 ("Upon motion of the Director of the [BOP]…the Court may reduce a term of imprisonment…"); *id*. At cmt n.4 ("A reduction under this policy statement may be granted only upon motion by the Director of the [BOP]."); *see also Brown* at 449 (describing the old policy statement as "outdated," adding that the Commission "has not made the policy statement for the old [statutory] regime applicable to the new one."); *United States v Ebbers*, -- F. Supp. 3d----, 2020 WL 91399, at *4 (S.D.N.Y. 2020) (describing the old policy statement as "at least partly anachronistic").

Accordingly, a majority of district courts have concluded that the "old policy statement provides helpful guidance, [but]…does not constrain [a court's] independent assessment of whether "extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." *United States v. Beck,* --- F. Supp. 3d ---, No. 13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also Brown*, 411 F. Supp. 3d at 451 ("[T]he most natural reading of the amended § 3582(c)…is that the District Court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it."); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOPs role."); *United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020)

("Application Note 1(D)'s prefatory language, which requires a [catchall] determination by the BOP Director is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance... [R]estricting the Court to those reasons set forth in §1B1.13 cmt.n.1(A)-(C) would effectively preserve to a large extent the BOP's role as exclusive gatekeeper, which the First Step Act substantially eliminated"); *United States v. Young,* 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."); *Maumau,* 2020 WL at *2-*3 (D. Utah Feb. 18, 2020) (collecting cases).

WHEREFORE, and for all the reasons argued in this Petition, Mr. Hassan request that this Honorable Court:

A.     Schedule an immediate hearing, done remotely, via Zoom, or a similar online, video conference method;

B.     In the alternative, Mr. Hassan requests that the Court render a decision on the Pleadings in this Case, without oral argument;

C.     Order Mr. Hassan from the BOP immediately.

Respectfully submitted,

HALL MAKLED, PC

/s/ *Amir I. Makled*
*Attorney for Defendant*
23756 Michigan Ave, Ste. 300
Dearborn, Michigan 48124
Phone: (313) 788-8888
Email: amakled@hallmakled.com

Dated: July 27, 2020

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                    Case No. 18-cr-20089-02
                                          Hon. Matthew F. Leitman

v.

KHALED BILAL HASSAN,

        Defendant.

_____/

## ORDER DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY (ECF No. 99) AND AMENDED MOTION FOR RELEASE FROM CUSTODY (ECF No. 100)

On May 29, 2020, Defendant Khaled Bilal Hassan filed a Motion for Compassionate Release (ECF No. 99). On May 30, 2020, Hassan filed an Amended Motion for Compassionate Release (ECF No. 100), and his original motion was stricken from the record.

Under 18 U.S.C. § 3582(c)(1)(A), a defendant may not file a motion for compassionate release until "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." In Hassan's motion, he acknowledges that he has not satisfied either requirement. (*See* Am. Mot. for

Compassionate Release, ECF No. 100, PageID.803.)  But Hassan argues that "in this instance exhaustion is not required." (*Id.*)

On June 2, 2020 – three days after Hassan filed his amended motion – the Sixth Circuit clarified that the exhaustion requirement in § 3582(c)(1)(A) is "mandatory" and is not subject to any "judge-made exceptions." *United States v. Alam*, --- F.3d ---, 2020 WL 2845694, at *2–4 (6th Cir. June 2, 2020).  Thus, before Hassan can file a motion for compassionate release in this Court, he must either (1) exhaust his administrative remedies or (2) wait until 30 days have lapsed since the warden at his facility received his request for compassionate release.

Accordingly, the Court **DENIES WITHOUT PREJUDICE** Hassan's Motion for Compassionate Release (ECF No. 99) and his Amended Motion for Compassionate Release (ECF No. 100).  Hassan may re-file a motion for compassionate release in this Court after he has complied with § 3582(c)(1)(A), at which point the Court will consider the merits of Hassan's motion.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 12, 2020

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 12, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9761

# EXHIBIT B

# INMATE REQUEST TO STAFF MEMBER RESPONSE

**NAME:** Hassan, Khaled Bilal
**REG. NO.:** 56317-039

---

This is in response to your Inmate Request to Staff Member, received on June 17, 2020 in which you request consideration for a reduction in sentence (RIS)/compassionate release. Specifically, you be considered due to Extraordinary or Compelling Circumstances.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons. BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner. Your request has been evaluated consistent with this general guidance.

The BOP is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates. We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus. However, your concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence. Accordingly, your RIS request is denied at this time.

If you are not satisfied with this response to your request, you may commence an appeal of this decision via the administrative remedy process by submitting your concerns on the appropriate form (BP-9) within 20 days of the receipt of this response.

Date: 7-7-20

F. J. Bowers, Warden

cc: Medical Records
    Unit Team

# EXHIBIT C



**EASTBORN**
**MEDICAL GROUP P.C.**

**Dr. Assem Elfakih**
**15044 Michigan Ave**
**Dearborn, MI 48126**
**Ph: 313-406-5007**
**Fax: 313-406-5419**

Date: 05/15/2020
Regarding: Khaled Hassan
Date of Birth: 12/17/1986

To whom it may concern:
Khaled Hassan (Date of Birth: 12/17/1986) is a patient in our office that has type two diabetes and Asthma. Khaled is highly susceptible to COVID 19 complications.

If you have any questions or concerns please feel free to contact my office.
Sincerely,

Assem Elfakih, M.D.

**EASTBORN MEDICAL GROUP, PC**
**15044 MICHIGAN AVE.**
**DEARBORN, MI 48126-2914**

Scanned with CamScanner