UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

                                 Case No. 18-cr-20089

          Plaintiff,

                                 Hon. Matthew F. Leitman
v.                                United States District Judge

Khaled B. Hassan,

          Defendant.

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

Hassan pleaded guilty to a scheme involving the defrauding of hundreds of thousands of dollars from elderly victims. Hassan's co-conspirators tricked elderly victims into believing that their grandchildren had been arrested and convinced them to send packages containing large amounts of money to vacant addresses in the Flint, Michigan area for what the victims believed would be bail or attorneys' fees. Hassan was one of the individuals who picked up the packages containing money.  Hassan pleaded guilty but contested the amount of

loss that he was responsible for. After a sentencing hearing that spread over multiple dates and briefs, the Court agreed with the government's loss calculation and determined the appropriate guideline range to be 51 - 63 months imprisonment. On September 19, 2019, this Court sentenced Hassan to 18 months in federal prison.

Hassan began serving his current sentence on November 5, 2019. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Hassan does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). [Although Hassan's heightened risk from Covid-19 based on his diabetes and obesity may qualify as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Hassan is not otherwise eligible for release. The § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—do not support release because the offense is so serious and damaging that it precludes compassionate release.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Hassan, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of August 11, 2020, this process has already resulted in at least 7,405 inmates being placed on home confinement. *See* BOP Covid-19 Website. Given the Bureau of Prisons' efforts and the relevant factors that the Court must consider under 18 U.S.C. § 3553, the Court should deny Hassan's motion for compassionate release.

## Background

Hassan took part in a scheme to defraud the elderly, picking up packages of money that the victims sent to addresses in the Flint, Michigan area. Hassan's participation in the scheme was not lengthy, but the amount of loss during his participation in the conspiracy was

between $250,000 to $550,000. Hassan picked up numerous packages filled with money and also did a "money drop" to provide other unknown co-conspirators with money from the scheme. (R. 76: Govt. Sent. Mem., Pg.ID. 248). This was Hassan's first criminal conviction.

Hassan contested the amount of loss and the Court found for the government, determining the sentencing guidelines at 51 to 63 months. (R. 94: Sentencing Tr., Pg.ID 704). The Court then sentenced Hassan to a below guideline sentence of 18 months in federal prison.

Hassan began serving his prison sentence on November 5, 2019, and is currently incarcerated at Morgantown FCI. He is 32 years old, and his projected release date is March 6, 2021.[1] Hassan's underlying medical conditions include obesity and type II diabetes. Hassan has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Hassan initially filed a motion without properly exhausting his administrative remedies and the court dismissed his motion. Hassan has now properly exhausted his administrative remedies and the Court may consider his motion on the merits.

---

[1] It appears that Hassan is scheduled for transfer to a RRC facility in December 2020, though that is subject to change.

## Argument

I. **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

    A. **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic

5

inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19

completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in

deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,405federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their

criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular

9

inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Hassan's motion for compassionate release.

Hassan's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has

11

been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

Hassan must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

Even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the

defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

**B.    Hassan is not eligible for compassionate release.**

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way.

13

*Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau

of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Hassan and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

Hassan's medical records confirm that he has obesity and type II diabetes, which the CDC has identified as risk factors for Covid-19. Hassan has also claimed that he has asthma, but his 2019 and 2020 medical records (filed with this response under seal) provide little evidence of asthma, aside from a passing reference. Moreover, Hassan did not discuss asthma in his PSR, but he did discuss his diabetes. (PSR ¶ 49). There is nothing in Hassan's medical records that indicates he has asthma that rises to the "moderate or severe" level that may provide an increased risk of severe illness from Covid-19. Nevertheless, because of the heightened risk that Covid-19 poses to someone with

15

Type II diabetes and obesity, Hassan may satisfy the standard for "compelling and extraordinary" reasons under many circumstances.

Further, although a defendant's heightened risk from Covid-19 in prison might, in some circumstances, satisfy the medical or age criteria in USSG § 1B1.13 cmt. n.1, Hassan's circumstances cast doubt on whether that is true here. The *average* person may have a higher relative risk of contracting Covid-19 in prison than if released among the public at large. But § 1B1.13 requires an *individualized* assessment, and an individual defendant's relative risk varies widely. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *4–*5 (E.D. Mich. May 15, 2020). It depends on the precautions at his prison, the number of Covid-19 cases there, whether and how much that number might increase or decrease, the prison's medical facilities, the defendant's release plan, the threat from Covid-19 in his release location, his access to medical care if released, and his willingness to abide by release restrictions and social-distancing protocols. *See id.* Here, Hassan seeks release from Morgantown FCI, a facility which has a single active case amongst staff at the facility and has had zero cases of Covid-19 at the facility for prisoners during the entire Covid-19 pandemic. Hassan

16

seeks release to Michigan, a state which continues to unfortunately report hundreds of new Covid-19 cases per day. If the current trend at Morgantown FCI continues, there is a far greater incidence of Covid-19 in the Detroit, Michigan area than at Morgantown FCI. In fact, cases in Monongalia County, the county where Morgantown FCI is located, have recently decreased, with only one new case reported yesterday. https://www.wvpublic.org/post/our-west-virginia-covid-19-tracker-gives-you-county-level-data-coronavirus#stream/0. In the current situation, with a continuing outbreak in Michigan and no cases amongst inmates for the entire pandemic in Morgantown FCI, Hassan is not necessarily at greater risk in his current situation than he would be in Michigan.

The government does not believe that dangerousness precludes Hassan's release. While Hassan has prior arrests for assault, he does not have convictions for that behavior. Moreover, his role in this offense does not make him likely to reengage in fraudulent behavior, as he joined the collection of the money from the fraud rather than engineering the fraud itself.

## C.  The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). Here, the 18 § 3553(a) factors disqualify Hassan for compassionate release, because of the serious nature of this offense.

18

Hassan participated in an offense that targeted those most vulnerable and tricked them into believing that their loved ones had been imprisoned. His co-conspirators preyed upon their fears and used those fears to steal large amounts of savings amassed over the course of the victim's lives intended for use during their final years.

The victims vividly described the effects of the scheme Hassan participated in on their lives. Below are portions of four letters provided to the Court from victims of this scheme.

We were told she was involved in a serious traffic incident and it looked as though she was just a victim of being "in the wrong place at the wrong time".  The $8500 we gave to these despicable creatures would have much better served our daughter and her four young children.  By the grace of God, we did not respond to a second phone call, asking us to send more money, and called in the authorities.

Our only consolation is that these criminals have been apprehended, will pay their dues and hopefully will never consider upsetting other people's lives.  Any compensation we might receive would be extremely helpful to us and our

"Every morning, for about three months, I woke up feeling guilty, helpless, used and depressed. Did this really happen to me? It was emotionally devastating and financially horrid! As time went by I began to realize I would probably never see my money again.

Hassan's offense affected these victims in a manner that was lifelong both financially and emotionally. These victims have nightmares, are afraid to leave the house, feel shame and embarrassment, and have a severe loss of trust. It was difficult to discuss the case with them at times because some of the victims refused to believe that the agents or the government were actually who we purported to be.

Hassan may have only been in this offense for a short time, but he obtained enough profits from it during that time that he quit his job during the conspiracy so this was his only income. (PSR ¶ 59). Hassan may not have been at the top of this conspiracy, but it needed those in Hassan's role to function.

Overall, the nature and circumstances of this offense are serious enough that compassionate release is not appropriate, given the vast harm caused by the scheme.

### Conclusion

The Court should deny Hassan's motion.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

Dated: August 11, 2020          s/CHRISTOPHER W. RAWSTHORNE
Assistant United States Attorney
600 Church St., Flint, MI 48502
Phone: (810) 766-5177
christopher.rawsthorne@usdoj.gov
WI Bar 1059889

## ***CERTIFICATION OF SERVICE***

I hereby certify that on, August 11, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will electronically serve all ECF participants.

s/Jessica Stanton
United States Attorney's Office
